ROSELLE, *Appellant*, v. FARMERS' BANK OF NORBORNE; McAULIFFE, *Interpleader*.

### In Banc, July 17, 1897.*

1. **Lottery**: INTERSTATE COMMERCE. Certain parties in Missouri agreed to "pool" their tickets in a lottery in Louisiana, where the lottery was then legal. But a lottery being unlawful in Missouri, it is *held* that an agreement to share in the proceeds of a lottery drawn in a different State is not within the protection of the interstate commerce clause of the federal Constitution.

2. **Agreement to Share in Lottery Prize.** The nature of a lottery discussed and the policy of Missouri is declared to be adverse to lotteries; hence an agreement in this State for a share of lottery winnings in another State is void as against the public policy of Missouri.

3. **Practice**: RULE INVOKED BY COURT. The rule *"in pari delicto,"* etc., applies to actions to recover for breach of contract to pay over a share of a lottery prize; and that rule should be enforced by the courts on grounds of public policy when the facts are developed which demand its application, whether any party to the action invokes the rule or not.

4. **Gaming**: RECOVERY. Money lost at gaming may be recovered in Missouri under chapter 73, Revised Statutes 1889.

5. ———. This case is distinguished from *Roselle v. Beckemeier*, 134 Mo. 380, arising out of the same facts.

*Appeal from Carroll Circuit Court.*—HON. W. W. RUCKER, Judge.

REVERSED AND REMANDED.

*Hale & Son* and *J. W. Sebree* for appellant.

(1) The dealing in lottery tickets has been outlawed by the laws of the United States and Postoffice Department, as against good morals and public policy.

---

*NOTE.—Decided March 2, and rehearing denied July 17, 1897:

3 Am. and Eng. Ency. of Law, p. 556, *ante* and *post;* *Ruhe v. Buck*, 124 Mo. 178. (2) The plaintiff holds to the position that there is not a particle of evidence in this case, even tending to prove that these parties jointly purchased these tickets in Louisiana, but the evidence does show conclusively and without contradiction, that they were bought by these parties separately and independently of each other, and that whatever claim interpleader has to any portion of the money grows out of an alleged agreement among them made at Norborne, Missouri, to divide between them any prize that any one or more of the tickets they had already bought separately might draw. (3) The evidence of a purchase of an interest in the tickets in Missouri was at variance with the case made in interpleader's petition, which was "that the tickets out of which his interest in the money was derived, was by a joint purchase in the State of Louisiana." *Currier v. Lowe*, 32 Mo. 203; *Capital Bank v. Armstrong*, 62 Mo. 65; *Taylor v. Cayce*, 97 Mo. 249. (4) The evidence in the case at bar does not correspond with the allegation of interpleader's petition, nor is the verdict and judgment responsive to the issuues made by the pleading. *Harlan v. St. Louis*, 65 Mo. 22; *Hunt v. Railroad*, 89 Mo. 607. (5) Plaintiff's instructions should have been given. The evidence in this case shows clearly that the only claim interpleader has to any portion of this prize money grows out of an alleged agreement made at Norborne, Missouri, to form a club-pool, their issues—founded solely upon the contingency or chance that some one or more of their tickets would draw a prize in the Louisiana lottery, and divide the spoils of their unholy alliance made in violation of the Constitution and laws of the State. "No court of justice can in its nature be made the handmaid of iniquity." *Sprague v. Rooney*, 104 Mo. 358; *Tod v. Rafferty's*

*Adm'r*, 30 N. J. Eq. 260; *Tyler v. Larimore*, 19 Mo. App. 445; *Buckingham v. Fitch*, 18 Mo. App. 91; *Thatcher v. Morris*, 1 Kern (N. Y.), 137; *Kitchen v. Greenabaum*, 61 Mo. 110; *Scudder v. Atwood*, 55 Mo. App. 512. (6) Plaintiff recovered judgment below for one seventh only, when the pretended agreement with the banker was that three sevenths should be placed to his credit. But that agreement was of no legal effect. It was executory, and will not be enforced. 1 Tiedeman, Eq. Jur., sec. 227, note 1, 2 and 3, and cases cited. It would not have been executed till the money was actually paid to interpleader. 30 N. J. Eq. 260, *supra*. Such agreement was without consideration. *Swaggard v. Hancock*, 25 Mo. App. 607; *Gwinn v. Simes et al.*, 61 Mo. 338. A moral obligation without a previous legal obligation to support it will not support an express promise. *Musick v. Dodson*, 76 Mo. 627; *Harrison v. McGuire*, 18 Mo. App. 517.

*Morton Jourdan* for respondents.

(1) Plaintiff, having failed to answer, reply to or deny the new matter set up in respondent's reply to plaintiff's answer to the interplea, will be taken to have confessed and admitted such new matter. (2) It is evident from the reading of the opinion of the court in *Roselle v. The Farmers' Bank of Norborne*, 119 Mo. 84, that the matters of difference between plaintiff and the interpleaders are *res adjudicata*, and especially is this true when the answer of the defendant bank and the interplea of respondents are read. They contain the same facts and are supported by the same evidence. *Givens v. Thompson*, 110 Mo. 432; *Galbreath v. Rogers*, 45 Mo. App. 324; *Galbreath v. Newton*, *Ib.* 312; *Nave v. Adams*, 107 Mo. 414. (3) That the tickets were purchased at New Orleans, in the State of Louisiana,

and not in Missouri, there can be no question. The Louisiana State lottery was duly incorporated and the sale of its tickets made legal by the laws of Louisiana. Acts of Louisiana (1868), p. 24. The sale then of lottery tickets in that State to citizens of this State was entirely legal, and not in violation of the laws of this State. *Hatch v. Hanson*, 46 Mo. App. 332; *State v. Shaeffer*, 89 Mo. 271; *State v. Wingfield*, 22 S. W. Rep. 363; *McIntyre v. Parks*, 3 Metcalf (Mass.), 207; *Kentucky v. Bosaford*, 6 Hill (N. Y.), 526; *Case v. Riker*, 10 Vt. 482; *Kling v. Fries*, 33 Mich. 275. (4) The contract in this case has been executed. The three tickets purchased by the seven parties in interest drew prizes, which were paid to plaintiff, and the $2,568 draft received by him in payment was deposited with the defendant, and the proceeds of said draft were at the time this suit was instituted in possession of the bank as bailee, and are now in possession of the court. The claim of the other six interested parties is for money had and received. This being true, the judgment of the trial court protecting the results will be affirmed. *Hatch v. Hanson*, 46 Mo. App. 332; *Cahn v. Kensler*, 34 Fed. Rep. 472; *Kentucky v. Bosaford*, 6 Hill (N. Y.), 526; *Martin v. Richardson*, 21 S. W. Rep. (Ky.) 1039; *Stix v. Mathews*, 63 Mo. 371; *McIntyre v. Parks*, 3 Metc. (Mass.) 207; *Jameson v. Gregory*, 4 Metc. (Ky.) 370. (5) Is plaintiff to be permitted or to be heard to say that the contract of which he is the beneficiary, in which he is the principal participant, one formed at his special instance and urgent solicitation, is illegal and against public policy, in order that he may be enabled to embezzle and appropriate the proceeds of the draft in which he has no other interest than one seventh? *Hatch v. Hanson*, 46 Mo. App. 332; *Martin v. Richardson*, 21 S. W. Rep. 1039; *Armstrong v. Toller*, 11 Wheat. 258; *Catts v.*

*Phalen,* 2 How. 336; *Holman v. Johnson,* 1. Cowper, 343; *Bank v. Bank,* 16 Wall. 483; *McBlair v. Gibbs,* 17 How. (U. S.) 232; *Brooks v. Martin,* 2 Wall. 70; *Warren v. Hewitt,* 45 Ga. 501; *Booeam v. Crane,* 103 Mass. 522; *DeLeon v. Trevine,* 49 Texas, 88.

BARCLAY, C. J.—This appeal is a part of the same litigation described in *Roselle v. Beckemeier* (1896) 134 Mo. 380 (35 S. W. Rep. 1132). The statement of facts then made is applicable to this appeal also, except so far as modified in this opinion.

Mr. McAuliffe was one of the club of seven who agreed to hold, as a joint venture, the tickets they had obtained in the Louisiana lottery. But there is this vital difference between his position and that of Mr. Becke-meier, the claimant in the other case. McAuliffe was not named or provided for in the agreement between the bank, Roselle, Beckemeier and Tassaro, touching the collection of the draft for the prize money and the distribution of the proceeds of collection. The one seventh share of winnings, which McAuliffe might have claimed under the club agreement, was included in the three sevenths part of the proceeds to be paid by the bank to Roselle when the collection was made (according to the agreement with the bank). But plaintiff did not agree to accept that share for Mc-Auliffe, nor did he recognize the latter's right to any part of the fund, at that adjustment. He declared that McAuliffe and Smith would have to get their shares by law if at all; and he told them so immediately after-ward. That left McAuliffe to assert his claim to any part of the fund directly against the plaintiff to whom that part of the proceeds was payable. The bank was under no obligation to pay any part of the fund to Mc-Auliffe.

The claim of McAuliffe was tried along with that

of Beckemeier and with a like result, namely, a finding in favor of McAuliffe for the same amount as found for Beckemeier, one seventh of the fund in court. Plaintiff appealed, after the customary steps for review.

1.  The plaintiff, under the agreement with the bank, was entitled to receive the one seventh share which McAuliffe claims and which the trial court adjudged to him. But it is plain that the validity of McAuliffe's claim depends on the validity of the original agreement to pool the club tickets. That agreement was made at Norborne in this State, and its legality is to be determined by the laws of Missouri. The facts that the lottery, to which the tickets referred, was to be drawn in Louisiana, and that the tickets and the lottery were valid there, do not give the tickets (or the dealings concerning them) validity in this State.

The people of the State of Missouri "have the inherent, sole and exclusive right to regulate the internal government and police thereof," subject to the paramount force of the federal laws. Const. 1875, art. 2, sec. 2. The federal laws do not sanction the agreement here in question or add anything toward improving its legal quality as determined by the local law. A ticket in a lottery, authorized at the place of issue, can not certainly be regarded as within the protection of the interstate commerce clause of the federal Constitution; certainly not in view of the legislation of Congress touching lotteries. U. S. R. S. (1878), sec. 3894; *People v. Noelke* (1883) 94 N. Y. 137; *Horner v. United States* (1893) 147 U. S. 449 (13 Sup. Ct. Rep. 409).

2.  The "club" agreement to share the prize that the ticket of any member might draw is therefore to be tested by Missouri law. Besides the sections of the criminal law, quoted in the *Beckemeier* case, must also be borne in mind the civil statute in regard to gaming which plainly defines a public policy on that subject

which the courts can not ignore. R. S. 1889, ch. 73. The effect of that statute is to set the seal of legislative disapproval on gaming contracts. Is an agreement of which lottery tickets form the subject-matter a gaming contract? A lottery is a species of gaming, as is settled by authority, if indeed authority be needed for so clear a proposition. *Lowry v. State* (1827) 1 Mo. 722; *State v. Kennon* (1855) 21 Mo. 262; *Com. v. Sullivan* (1888) 146 Mass. 142 (15 N. E. Rep. 491).

By the bargain in the case at bar each member of the club acquired interests in other lottery tickets than his own. That enlargement of his interest in the result of the lottery drawing was obtained by a contract in this State. The agreement was a gaming one in its nature. It increased the chances of each member to win something in the then approaching drawing of lots at New Orleans. It is not essential to determine whether the transaction fell within the class of criminal acts defined in section 3833 (R. S. 1889). If it did not precisely do so, it came dangerously near, for that section forbids, under a penalty, anyone to "aid or assist, or be in anywise concerned in the sale . . . . . . . of any share or part of any lottery ticket in any lottery, or device in the nature of a lottery, within this State or elsewhere." Whether the transaction between the club members was strictly a sale within the meaning of this penal law, we shall not now inquire. Considering, however, the terms of that act and of the gaming law, we can not doubt that the public policy of the State is by them manifestly indicated in disapproval of contracts such as that involved in this case.

In *Kitchen v. Greenabaum* (1875) 61 Mo. 110, certain dealings in regard to a lottery ticket were held to furnish no ground of action because contrary to public policy, and we do not consider the agreement now in view occupies any better legal ground. (Com-

pare *Goodrich v. Houghton* (1892) 134 N. Y. 115, 31 N. E. Rep. 516.)

A Missouri agreement in the nature of a partnership in lottery tickets can not, we think, properly be the subject of an accounting and settlement in a Missouri court. Our jurisprudence withholds the aid of the courts for the enforcement of such arrangements, and usually leaves the parties thereto where they have placed themselves. It is true that the plaintiff himself, in the estimation of law, is equally as culpable as the claimant, whose claim, under the illegal agreement, he defeats because of the rule that in case of equal wrong the party in possession has the better standing. That maxim of the law is not, strictly speaking, a mere defense to an action. It is a rule of public policy, founded on moral principle, and should be enforced by the courts whenever facts are developed justifying its application, whether the rule be pleaded or suggested by any party to the action, or not. The rule is established for the sake of the moral example it affords, not for the benefit of the wrongdoer in possession of illegal spoil. *Seidenbender v. Charle's Adm'r* (1818) 4 S. & R. 173.

There are, no doubt, states of fact which have been held to afford reasons for withholding application of that rule. And sometimes exceptions to it are made by positive law, as, for instance, by the terms of chapter 73 (R. S. 1889) permitting money lost at gaming to be recovered. But McAuliffe's claim can not be located in any of the exceptional classes. Neither plaintiff nor the bank received even the original dollar he paid for his chance in the game. McAuliffe is not seeking to recover back any money he has lost or paid. He only asks the aid of the court to secure part of a prize fund which his lottery investment is supposed to have won.

3.   There is no occasion, in this connection, to investigate any supposed distinction between an act made wrong because prohibited by law, and one which is wrong *in itself* (as many ancient books express it). To quote the language of Judge LINDLEY, "what judicial tribunals have to regard is the law they are called on to administer; and what is forbidden by that law is illegal, whether it is also forbidden by the laws of morality and religion or not." 5 Lindley, Partnership, *p. 94. The agreement to share in the winnings of the lottery tickets is plainly gaming and is illegal, by force of our organic and statutory law, as against the well defined public policy of the State.   Missouri courts can not be used to enforce it, on the facts shown.

4.   Nor can McAuliffe's claim be elevated into legality by reason of the transaction concerning the collection of the draft by the bank.  The adjustment of account then made between the parties present did not amount even to a statement of account between plaintiff and McAuliffe.  Plaintiff then made no agreement to account to McAuliffe for the share of proceeds which plaintiff was to receive upon the collection of the draft, nor did he then agree with anyone that McAuliffe should receive any part of those proceeds.   So we need not consider what effect an account stated might have had toward laying a foundation for applying in McAuliffe's favor the principle declared in the *Beckemeier* case.   The facts do not permit the application of that principle.

5.   We   regret that some of the views above expressed are not entirely in accord with *Hatch v. Hanson* (1891) 46 Mo. App. 323; but, with the greatest respect for our learned brethren who participated in that case, we find ourselves unable to concur in all the rulings made therein.

6. The finding in favor of McAuliffe is reversed, and the cause is remanded for further proceedings in conformity with this opinion. MACFARLANE, BURGESS, ROBINSON and BRACE, JJ., concur; Judges GANTT and SHERWOOD, absent.